**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

Case No.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE
FARM FIRE AND CASUALTY
COMPANY,

      Plaintiffs,

v.

ADVANTACARE OF FLORIDA, LLC,
CRN RECEIVABLE MANAGEMENT
LLC,
ADVANTACARE MULTI-SPECIALTY
GROUP, LLC,
KERRIANN FITZPATRICK, f/k/a
KERRIANN HERZOG,
JOHN MANCUSO,
KENNETH HOWE, and
FRANK SEVERIANO ALVAREZ JR.,
M.D.,

      Defendants.
_____/

## <u>COMPLAINT</u>

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and

State Farm Fire and Casualty Company ("State Farm Fire"), bring this complaint against

Advantacare of Florida, LLC ("Advantacare of Florida"), CRN Receivable Management LLC

("CRN Receivable Management"), Advantacare Multi-Specialty Group, LLC ("Advantacare

MSG"), Kerriann Fitzpatrick f/k/a Kerriann Herzog ("Fitzpatrick"), John Mancuso ("Mancuso"),

Kenneth Howe ("Howe"), and Frank Severiano Alvarez Jr., M.D. ("Dr. Alvarez") (collectively,

"Defendants") and allege as follows:

I.    **NATURE OF THE ACTION**

1.    This action involves an unlawful scheme orchestrated by Defendants to obtain payments from State Farm Mutual and State Farm Fire through the submission of thousands of medical bills and related documentation for services purportedly provided to individuals involved in automobile accidents and eligible for Personal Injury Protection Coverage ("PIP Benefits") and Medical Payments Coverage ("MPC") (collectively, "No-Fault Benefits") under State Farm Mutual and State Farm Fire automobile insurance policies.

2.    Advantacare of Florida operated unlawfully as an unlicensed health care clinic from January 2013 through December 2016 when it ceased operations. Dr. Alvarez purported to wholly own Advantacare of Florida in order for Advantacare of Florida to unlawfully claim an exemption from Florida's mandatory health care clinic licensure laws.[1] In reality, Advantacare of Florida never qualified for an exemption from licensure because it was owned—at least in part—and controlled by three unlicensed laypersons: Fitzpatrick, Mancuso, and Howe.

3.    Advantacare of Florida was succeeded by Advantacare MSG, a licensed health care clinic that operated the same seven clinic locations as Advantacare of Florida.  Advantacare MSG began operating in January 2017 and continues operating today. The services Advantacare MSG provided at the five clinic locations where Dr. Alvarez purportedly served as medical director are unlawful because Advantacare MSG and Dr. Alvarez failed to comply with their statutory and administrative medical director duties, including the failure to: (i) conduct systematic reviews of Advantacare MSG's billings to ensure the billings were not fraudulent or unlawful; (ii) take

---

[1] Non-party John Madlener, M.D. ("Dr. Madlener") also purported to have an ownership interest in Advantacare of Florida for a period of time. As discussed below, the membership interests of Advantacare of Florida were sold to Advantacare Holdings, LLC ("Advantacare Holdings"), an entity purportedly owned by Dr. Alvarez and Dr. Madlener, in December 2012. Dr. Madlener claims to have relinquished his ownership interest in or around 2013.

immediate corrective action upon discovery of an unlawful charge at Advantacare MSG; (iii) ensure all health care practitioners at Advantacare MSG had active appropriate certification or licensure for the level of care being provided; and (iv) provide day-to-day supervision of Advantacare MSG.  Thus, the claims and charges related to the services performed at Advantacare MSG are not compensable under Florida law.  *See* Fla. Stat. § 400.9935(3) ("A charge or reimbursement claim made by or on behalf of a clinic . . . that is otherwise operating in violation of this part . . . is an unlawful charge and is noncompensable and unenforceable.").

4. This action asserts common law claims for unjust enrichment as well as statutory claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Florida Statutes § 501.201-501.213) to recover actual damages of at least $4.5 million paid to Advantacare of Florida and $2.9 million paid to Advantacare MSG, plus costs and reasonable attorneys' fees for violations of FDUTPA.  This action also seeks a declaratory judgment that State Farm Mutual and State Farm Fire are not liable for any unpaid charges that Advantacare of Florida and Advantacare MSG have submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire to the extent the charges relate to claims in which services were not lawfully rendered.

## II.  JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to State Farm Mutual's and State Farm Fire's claims occurred in this judicial district.

## III.  THE PARTIES

**A.     Plaintiffs**

7.     State Farm Mutual is a citizen of the state of Illinois.  It is incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual is authorized to conduct business in Florida and issues automobile insurance policies in Florida.

8.     State Farm Fire is a citizen of the state of Illinois.  It is incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Fire is authorized to conduct business in Florida and issues automobile insurance policies in Florida.

**B.     Defendants**

9.     Advantacare of Florida is a Florida limited liability company, formed in November 2009, with its principal place of business at 2808 Enterprise Road, Suite 105, Debary, Florida 32713. Advantacare of Florida was a multi-disciplinary medical practice, operating as a health care clinic that provided orthopedics, neurology, interventional pain management, physical medicine and rehabilitation, physical therapy, and diagnostic imaging from seven locations: (i) 1040 Mason Ave., Daytona Beach, Florida (the "Daytona Beach Location"); (ii) 697 Maitland Ave., Altamonte Springs, Florida (the "Altamonte Springs Location"); (iii) 2808 Enterprise Road, Suite 105, Debary, Florida (the "Debary Location"); (iv) 539 South Chickasaw Trail, Orlando, Florida (the "East Orlando Location"); (v) 815 Good Homes Road, Orlando, Florida (the "West Orlando Location"); (vi) 3546 St. Johns Bluff Road S., Suite 108, Jacksonville, Florida (the "Jacksonville Location"); and (vii) 9 Pine Cone Drive, Suite 104A, Palm Coast, Florida (the "Palm Coast Location"). Advantacare Holdings, a Florida limited liability company, is the sole member

of Advantacare of Florida, and Dr. Alvarez is purportedly the sole member of Advantacare Holdings.[2]

10.     CRN Receivable Management is a Delaware limited liability company that was formed on July 1, 2013 and has been authorized to transact business in Florida since December 30, 2014. Fitzpatrick is the sole member of CRN Receivable Management and serves as its Managing Member. Between December 2015 and December 2016, CRN Receivable Management endorsed and deposited more than $1.2 million in drafts that were issued by State Farm Mutual and State Farm Fire to Advantacare of Florida for the payment of No-Fault Benefits.

11.     Advantacare MSG is a Florida limited liability company, formed in December 2015, with its principal place of business at 697 Maitland Avenue, Altamonte Springs, Florida 32701. The members of Advantacare MSG are unlicensed laypersons Fitzpatrick, Mancuso, and Howe. Advantacare MSG has operated as a health care clinic licensed by Florida's Agency for Health Care Administration ("AHCA") since January 2017 and is currently in operation. Advantacare MSG succeeded Advantacare of Florida and operates at the seven locations listed above that were previously operated by Advantacare of Florida.

12.     Dr. Alvarez is a citizen of Florida and resides in Volusia County, Florida.  Dr. Alvarez has been licensed to practice medicine in Florida since 1977. Dr. Alvarez purported to wholly own Advantacare of Florida, which allowed Advantacare of Florida to unlawfully claim an exemption from Florida's mandatory health care clinic licensure laws. Following Dr. Alvarez's retirement from the practice of medicine in or around March 2016, Dr. Alvarez became the medical

---

[2] Dr. Madlener was also purportedly a member of Advantacare Holdings along with Dr. Alvarez from December 2012 through approximately 2013. Dr. Madlener is a citizen of Florida and resides in Brevard County, Florida.

director of Advantacare MSG's Daytona Beach, Altamonte Springs, Debary, East Orlando, and Palm Coast Locations.

13.     Fitzpatrick is a citizen of Florida and resides in Orange County, Florida. Fitzpatrick is not a licensed health care professional in Florida. Fitzpatrick secretly held an ownership interest in Advantacare of Florida and served as the Director of Operations from at least December 2012 through December 2016. Fitzpatrick currently owns a 1/3 interest in Advantacare MSG and serves as the Administrator/Managing Employee of Advantacare MSG, responsible for the daily operation of Advantacare MSG.

14.     Mancuso is a citizen of Florida and resides in Volusia County, Florida.  Mancuso is not a licensed health care professional. Mancuso secretly held an ownership interest in Advantacare of Florida and served as the clinic's office manager. Mancuso currently owns a 1/3 interest in Advantacare MSG and serves as the Chief Financial Officer of Advantacare MSG.

15.     Howe is a citizen of Florida and resides in Volusia County, Florida. Although Howe is not a licensed health care practitioner, he is a Certified Radiologic Technologist, which permits him to perform certain limited functions under the supervision of a licensed practitioner, but does not permit him to own a health care clinic without the clinic obtaining a license. Howe secretly held an ownership interest in Advantacare of Florida and served as an administrator in charge of public relations, personnel, and business affairs. Howe currently owns a 1/3 interest in Advantacare MSG.

## IV.     RELEVANT BACKGROUND

### A.     The Health Care Clinic Act

16.     In 2003, the Florida Legislature enacted the Health Care Clinic Act ("HCCA") (Florida Statutes § 400.990-400.995) based on its finding that "the regulation of health care clinics

must be strengthened to prevent significant cost and harm to consumers."  Fla. Stat. § 400.990(2).

The express purpose of the Act "is to provide for the licensure, establishment, and enforcement of

basic standards for health care clinics and to provide administrative oversight by the Agency for

Health Care Administration." *Id.*

17.     The HCCA makes it unlawful for a clinic to operate without a license from AHCA

unless it meets one of the specifically enumerated exemptions set forth in the HCCA. Fla. Stat. §

400.991.

18.     In furtherance of the HCCA's goal of clinic oversight, a licensed clinic must

"appoint a medical director . . . who shall agree in writing to accept legal responsibility" for various

activities identified in the HCCA.  Fla. Stat. § 400.9935(1).  A "medical director" is "a physician

who is employed or under contract with a clinic and who maintains a full and unencumbered

physician license in accordance with chapter 458, chapter 459, chapter 460, or chapter 461."  Fla.

Stat. § 400.9905(5) (defining "medical director").

19.     The HCCA sets forth duties medical directors must perform on behalf of licensed

clinics, including, but not limited to, the duty to "[c]onduct systematic reviews of clinic billings to

ensure that the billings are not fraudulent or unlawful" and "[u]pon discovery of an unlawful

charge . . . take immediate corrective action."  Fla. Stat. § 400.9935(1)(g).  Medical directors are

also required to "[e]nsure that all health care practitioners at the clinic have active appropriate

certification or licensure for the level of care being provided."  Fla. Stat. § 400.9935(1)(d).

20.     AHCA promulgated certain regulations to clarify a medical director's duties under

the HCCA:

> A licensed health care clinic may not operate or be maintained without the ***day-to-
> day supervision*** of a single medical . . . director as defined in Section 400.9905(5),
> F.S.  The health care clinic responsibilities under Sections 400.9935(1)(a)-(i), F.S.,
> cannot be met without an ***active***, appointed medical . . . director. Failure of an

> appointed medical . . . director to substantially comply with health care clinic responsibilities under Rule 59A-33.012, F.A.C. and Sections 400.9935(1)(a)-(i), F.S., shall be grounds for the revocation or suspension of the license and assessment of a fine pursuant to Section 400.995(1), F.S.

Fla. Admin. Code R. 59A-33.008(1) (emphasis added).

21.     If a clinic's medical director fails to satisfy his or her statutory and administrative duties, then the clinic is operating in violation of Florida Statutes § 400.9935 and any charge submitted by such clinic "is an unlawful charge and is noncompensable and unenforceable."  Fla. Stat. § 400.9935(3).

22.     However, a health care clinic is not required to obtain a license if it is "wholly owned" by one or more licensed health care practitioners. *See* Fla. Stat. § 400.9905(4)(g).

23.     The "wholly owned" exemption only applies if "one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws." As a result, the "wholly owned" exemption does not apply when a licensed health care practitioner fails to supervise the clinic's business activities or remain responsible for legal compliance, even if that health care practitioner purports to wholly own the health care clinic. *See* Fla. Stat. § 400.9905(4)(g).

### B.     The Florida Motor Vehicle No-Fault Law

24.     Under the Florida Motor Vehicle No-Fault Law (the "No-Fault Law"), each automobile owner or lessee is required to maintain, and each insurer is required to issue, a minimum amount of personal injury protection insurance coverage payable without regard to who is at fault in causing an accident.  *See* Fla. Stat. §§ 627.730-627.7405.  Automobile insurers like State Farm Mutual and State Farm Fire are required to provide PIP Benefits of at least $2,500, and up to $10,000 if the patient is determined to have an emergency medical condition, for losses resulting from injuries arising out of the ownership, maintenance, or use of a motor vehicle.

25.     Under the No-Fault Law, insurers are required to pay 80% of all reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to injuries caused by the accident up to the applicable cap of either $2,500 or $10,000. Fla. Stat. § 627.736(1)(a).

26.     Under the No-Fault Law, "medically necessary" means "a medical service or supply that a prudent physician would provide for the purposes of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is: (a) [i]n accordance with generally accepted standards of medical practice; (b) [c]linically appropriate in terms of type, frequency, extent, site, and duration; and (c) [n]ot primarily for the convenience of the patient, the physician, or other health care provider."  Fla. Stat. § 627.732(a)-(c).

27.     State Farm Mutual and State Farm Fire are required to pay or deny claims for PIP Benefits within 30 days, and may be ordered to pay interest and attorney's fees if they fail to pay the amount determined to be owed within that 30-day time period.

28.     Neither an insurer nor an insured is required to pay a claim or charge: (a) for services or treatment that were not lawful at the time rendered; or (b) to any person who knowingly submits a false or misleading statement relating to the claim or charges. Fla. Stat. § 627.736(5)(b)(1)(b)-(c). In the context of the No-Fault Law, "lawful or lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."  Fla. Stat. § 627.732(11).

29.     MPC is an optional insurance coverage that provides reimbursement benefits supplemental to PIP Benefits.  MPC covers the 20% PIP co-payment for which the insured would otherwise be responsible and also allows an insured to elect additional medical coverage above the

PIP Benefits minimum policy limits required by Florida law.  Similar to the law governing PIP

Benefits, pursuant to State Farm Mutual and State Farm Fire's applicable policies, MPC coverage

is only available for treatment that is medically necessary and lawfully rendered.

## V.   THE ILLEGAL SCHEME

### A.   Advantacare of Florida Operated Unlawfully as an Unlicensed Health Care Clinic

30.     Advantacare of Florida, a multi-disciplinary medical practice, tendered charges for

reimbursement for its health care services to automobile insurance companies like State Farm

Mutual and State Farm Fire. With regard to each patient listed in **Exhibit 1**, Advantacare of Florida

submitted one or more claims for payment of No-Fault Benefits to State Farm Mutual or State

Farm Fire. The insurers, to which Advantacare of Florida regularly submitted bills for

reimbursement, constitute third-party payors, which rendered Advantacare of Florida a health care

clinic as defined by the HCCA. *See* Fla. Stat. § 400.9905(4); Fla. Admin. Code R. 59A-33.006(14).

31.     Rather than submit to substantial AHCA oversight through health care clinic

licensure, Fitzpatrick, Mancuso, and Howe entered into an unlawful clinic ownership arrangement

with Dr. Alvarez to improperly claim the "wholly owned" licensure exemption for Advantacare of

Florida.

32.     Under this arrangement, Dr. Alvarez agreed to be held out to the public (and

AHCA) as wholly owning Advantacare of Florida to qualify for a licensure exemption, when, in

actuality, Fitzpatrick, Mancuso, and Howe owned, controlled, and operated Advantacare of

Florida.

33.     The purpose of this ownership arrangement was to unlawfully obtain substantial

insurance payments from State Farm Mutual, State Farm Fire and other insurance carriers while

avoiding the oversight, protections and mandatory obligations required by Florida's health care clinic licensure laws.

34.     As a result of this unlawful ownership arrangement, Advantacare of Florida operated as an unlicensed health care clinic from January 2013 through December 2016. As discussed below, Advantacare of Florida never qualified for the "wholly owned" exemption because Advantacare of Florida was not wholly owned by licensed health care practitioners and because a licensed health care practitioner owner did not supervise its business activities.

### i.     Sale of Advantacare of Florida

35.     Advantacare of Florida was formed in 2009 by two chiropractors—Barry Smith ("Smith") and Chris Recksiedler ("Recksiedler"). Smith and Recksiedler each held a 50% ownership interest in Advantacare of Florida and operated the clinic pursuant to a Health Care Clinic Certificate of Exemption.

36.     Approximately three years later, Smith and Recksiedler sold 100% of the membership interests in Advantacare of Florida to Advantacare Holdings. A copy of the Agreement for the Sale and Purchase of Membership Interests of Advantacare of Florida, LLC dated December 6, 2012 is attached as **Exhibit 2**. At the time, Advantacare Holdings was purportedly owned by Dr. Alvarez and Dr. Madlener.

37.     In or around March 2013, AHCA identified Advantacare of Florida's change in ownership following a review of the clinic's corporate filings. On April 9, 2013, AHCA sent a letter to Advantacare of Florida, informing the clinic that it "may be unlawfully operating without a proper Health Care Clinic exemption as a result of a change of ownership." *See* **Exhibit 3**.

38.     On April 24, 2013, Fitzpatrick sent an email to Isabelle Kalms, who worked in AHCA's Health Care Clinic Unit, and falsely represented that Advantacare of Florida was sold to

Dr. Alvarez and Dr. Madlener and thus, qualified for the "wholly owned" exemption from licensure. *See* **Exhibit 4**.

> **ii.** **Advantacare of Florida Was Not Wholly Owned by Licensed Health Care Practitioners**

39.     Contrary to the representations contained in Fitzpatrick's April 24, 2013 email to AHCA, Advantacare of Florida was not wholly owned by Dr. Alvarez and Dr. Madlener. Rather, Advantacare of Florida was owned—at least in part—and controlled by three unlicensed laypersons: Fitzpatrick, Mancuso, and Howe.

40.     Several factors clearly indicate Advantacare of Florida was not "wholly owned" by licensed health care practitioners.

41.     First, Dr. Alvarez did not wholly own the stock of Advantacare of Florida. According to an Affidavit of Advantacare Holdings that was signed by Fitzpatrick, Advantacare Holdings owned 100% of the membership interests in Advantacare of Florida. *See* **Exhibit 5** at ¶ 3. Mancuso, appearing as Advantacare of Florida's corporate representative, testified that two laypersons—himself and Fitzpatrick—along with Dr. Alvarez held ownership interests in Advantacare Holdings:

> Q.     Okay. And Alvarez is also an owner of Advantacare Holdings, right,
>        Advantacare Holdings, LLC?
> A.     Yes.
> Q.     And you were an owner of Advantacare Holdings, LLC?
> A.     Yes.
> Q.     Along with Carrie Herzog?
> A.     Yes.

July 31, 2018 John Mancuso Dep. Tr. 10:22-11:4.

42.     In addition, three health care professionals who worked for Advantacare of Florida have testified that Dr. Alvarez did not wholly own Advantacare of Florida:

> a.     Jason Smook, a physician assistant, testified that Advantacare of Florida
>        was owned by Fitzpatrick, Mancuso, Dr. Alvarez, and "Ken," which is

presumably a reference to Howe. October 23, 2017 Jason Smook Dep. Tr. 12:16-25.

b.     James Piotrowski, a physician assistant, testified that Advantacare of Florida was owned by three laypersons, including Fitzpatrick and Mancuso, and Dr. Alvarez. February 6, 2018 James Piotrowski Dep. Tr. 35:18-36:9; 93:19-94:4.

c.     Jason Tino, a chiropractor, testified that "Carrie" (an apparent reference to Fitzpatrick) held an ownership interest in Advantacare of Florida. July 11, 2018 Jason Tino Dep. Tr. 26:10-27:11.

43.     Second, Dr. Alvarez did not make any capital investments when Advantacare Holdings purchased the membership interests in Advantacare of Florida. Advantacare Holdings purchased the membership interests of Advantacare of Florida from Smith and Recksiedler for $2,380,000 *See* **Exhibit 2.** Advantacare Holdings also purchased Smith's and Recksiedler's personal goodwill related to the management and operation of Advantacare of Florida for $1 million. *See* **Exhibit 6**. Dr. Alvarez did not personally contribute any capital towards the purchase. Rather, Advantacare Holdings paid for the purchase by executing six promissory notes on December 31, 2012. *See* **Exhibit 7.**

44.     Third, Fitzpatrick, Mancuso, and Howe profited from Advantacare of Florida—a key indicator of ownership under the HCCA. For example, in 2016, State Farm Mutual and State Farm Fire issued 1,448 drafts to Advantacare of Florida totaling $1,290,341.92. Nearly all–1,443 of 1,448–of these drafts totaling more than $1.2 million were deposited into bank accounts belonging to CRN Receivable Management, an entity owned and controlled by Fitzpatrick. *See* **Exhibit 8**.

45.     The fact that CRN Receivable Management, an entity owned and controlled by Fitzpatrick, was the beneficiary of 99% of the revenue obtained by Advantacare of Florida from

State Farm Mutual and State Farm Fire in 2016 undermines any claim that Dr. Alvarez wholly owned Advantacare of Florida.

46.     Fourth, Dr. Madlener's separation from Advantacare of Florida is wholly inconsistent with that of a true owner. Dr. Madlener testified that Advantacare of Florida experienced cash flow issues shortly after the December 2012 sale. As a result, the other owners of Advantacare of Florida (who are not specified in his testimony) wanted him to forgo any compensation for an indefinite period of time, which he was not in a position financially to do. As set forth below, instead of selling his purported ownership interest in Advantacare of Florida, Dr. Madlener relinquished it in exchange for a salaried position:

> Q.     Do you still maintain that ownership interest?
> A.     No, sir.
> Q.     When did you relinquish that?
> A.     Not long thereafter. Maybe a year or so later.
> Q.     So approximately 2013 sometime?
> A.     Yes.
> Q.     And why did you relinquish ownership interest?
> A.     Because they -- we had just been -- **we had just taken kind of over the business, myself and <u>mostly</u> a neurologist.** And we were having some money issues. And -- and **they wanted me to basically not pay myself,** and I wasn't in a position to do that at that time. So I said: Okay, listen, I'll just -- you know, **I'll work for you and, you know, I'll give you my ownership rights.** I need -- I need to be paid somehow to pay my bills. So, you know, that's basically what happened.
> . . .
> A.     I wasn't in the position at that point to not have some sort of income for an unknown length of time, really.

October 11, 2017 Dr. Madlener Dep. Tr. 11:24-12:21 (emphasis added).

47.     The fact Dr. Madlener relinquished his ownership interest in Advantacare of Florida—in exchange for no value or payment—is wholly inconsistent with the amount paid for Advantacare of Florida less than a year prior. In fact, Advantacare of Florida was valued at $3,380,000 according to the Agreement for the Sale and Purchase of Membership Interests of

Advantacare of Florida, LLC and Good Will Purchase Agreement (*see* **Exhibits 2 and 6**) and had annual revenues of $10 to $12 million (*see* **Exhibit 5**). "Relinquishing" an ownership interest in such a seemingly valuable entity, without payment for such interest, is illogical and inconsistent with a valid ownership interest.

48.     Fifth, Dr. Alvarez did not participate in the management and control of Advantacare of Florida's business operations. Rather, Dr. Alvarez's involvement with the clinic was limited to the treatment of patients. Supervision and control of the clinic was performed by Fitzpatrick, Mancuso, and Howe.

49.     For example, Dr. Alvarez did not know whether Jason Smook, a physician assistant employed by Advantacare of Florida, left on good terms and stated that Fitzpatrick and Howe "were in charge of hiring and firing." October 10, 2017 Dr. Alvarez Dep. Tr. 21:23-22:2.

50.     Similarly, Dr. Alvarez testified that Howe was responsible for choosing the radiologist who read the MRIs performed at Advantacare of Florida. *Id* at 21:3-12.

51.     Dr. Alvarez was also unfamiliar with the pricing of Advantacare of Florida's MRIs and testified that he was not experienced in that area of the practice. *Id* at 30:16-31:13. Dr. Alvarez testified either Fitzpatrick or Howe handled MRI pricing but was "not sure which one actually did it or was responsible for it." *Id*.

52.     Dr. Alvarez was also unfamiliar with Advantacare of Florida's use of letters of protection and stated that Fitzpatrick, Howe, and Mancuso handled all "insurance/legal matters" *Id* at 44:14-45:4. Dr. Alvarez stated that Advantacare of Florida hired people to handle "insurance/legal matters" because it "was not [his] area of expertise." *Id*.

      **iii.**      **Advantacare of Florida's Business Activities Were Not Supervised by Dr. Alvarez**

53.     Advantacare of Florida also failed to qualify for the "wholly owned" exemption because Dr. Alvarez, the purported owner of Advantacare of Florida, failed to supervise Advantacare of Florida's business activities or ensure its compliance with all applicable federal and state laws as required by Florida Statutes § 400.9905(4)(g). Advantacare of Florida was actually supervised and controlled by Fitzpatrick, Mancuso, and Howe, and Dr. Alvarez's involvement with Advantacare of Florida was limited to the treatment of patients.

54.     As discussed above, Dr. Alvarez's October 10, 2017 deposition is replete with examples of his failure to supervise Advantacare of Florida. *See* ¶¶ 49-52.

55.     Dr. Alvarez's failure to supervise Advantacare of Florida allowed Fitzpatrick, Mancuso, and Howe to improperly influence the provision of health care services at Advantacare of Florida, which placed the clinic's profits ahead of patient care.

56.     For example, Fitzpatrick, Mancuso, and Howe directed the health care practitioners at Advantacare of Florida to order MRIs at the outset of treatment, regardless of whether the MRIs were medically necessary. In fact, Dr. Taufiq Ahmed was terminated from Advantacare of Florida because he refused to immediately order MRIs for the patients he examined:

> Q.     Okay. So, I guess I'm trying to figure out, under what terms did you leave? Were – that's what I'm saying, were you laid off? Were you terminated? Did you quit? I'm just trying to --
>
> A.     I think the way we -- it was it was mutual, but it was them who made the decision at the time to make that -- to terminate the relationship.
>
> . . .
>
> Q.     Okay. And you indicated, you believe there was a difference of opinion as far as treatment plan. Give me an idea of what you mean by that.
>
> A.     For example, I would -- typically, if a patient wasn't showing signs of neurological damage, tingling, numbness, burning pain, sharp pains running down the leg, **I wouldn't order MRIs immediately**. I would start them with basic imaging, x-rays, conservative care, et cetera. And if that didn't work, then we would move up in terms of additional treatments. **The impression that I got from them is that -- that I took too long to develop the patient.**

Oct. 19, 2017 Taufiq Ahmed Dep. Tr. 20:8-14; 21:16-22:2 (emphasis added).

57.     Jason Smook, a physician assistant who worked for Advantacare of Florida, also

testified that Fitzpatrick and Mancuso instructed him to order MRIs at the outset of treatment:

> Q.     [W]as it ever discussed with you that early MRIs were a positive thing at
> Advantacare?
> . . .
> THE WITNESS: Yeah.
> . . .
> Q.     I'll rephrase. What was the discussion?
> A.     The discussion was that **we have our own facilities for providing these
> tests and we want you to utilize them.** And the expectation was that these
> could benefit patient's cases. Now, in the instance that this was discussed
> in any instance, because there was more than one, based on the amount that
> were being ordered, and **it was probably one of the greater reasons why
> Dr. Ahmed got let go, is because he objected to it unless it was
> absolutely medically prudent.**
> Q.     Objected to early MRIs?
> A.     Yeah, exact -- we could get x-rays. But if we weren't going directly to
> interventional treatments, there was -- or they didn't have a physical finding
> that you worried about something that you may be missing, outside of
> getting that MRI to confirm what your -- the possibility of something worse
> or surgical may be going on, **we would wait.** So --
> **Q.     Who had this discussion with you?**
> A.     That was discussed by both **Carry [sic] Herzog** and **John Mancuso**.

Oct. 23, 2017 Jason Smook Dep. Tr. 49:12-50:18 (emphasis added).

58.     Another example of improper layperson involvement with the provision of health

care services at Advantacare of Florida involved James Piotrowski, a physician assistant who

worked for Advantacare of Florida. Mr. Piotrowski resigned from Advantacare of Florida after

Mancuso instructed him to perform a "sham" injection in order to preserve a relationship with a

chiropractor who referred patients to Advantacare of Florida:

> Q.     When you say the non-physician owner instructed you to follow what the
> chiropractor wanted for the patient, was it Dr. Madlener or Dr. Alvarez?
> A.     Neither.
> Q.     Does the name Kenneth Howell or John Mancuso sound familiar?
> A.     Yes, ma'am.
> Q.     Why do those names sound familiar?

A.      **Because it was John Mancuso who ordered me to do what needed to be done**.·Thank you for jogging my memory.

Q.      And when you say "what needed to be done," was that the word?

A.      Well, he wanted me to do the injections.

Q.      To the best that you can recall, what was said to you?

A.      Why aren't you doing this?

Q.      And your response?

A.      My response is the patient's a diabetic.· Her blood sugar is 320. I'm going to give her steroids? Well, then just give her an injection. No.·I'm not just going to give her lidocaine injections.· **That's fraud.** I'm not doing that.

Q.      Why would you consider a lidocaine injection fraud?

A.      **It's phony. All you're doing is numbing up their skin.**· You're not putting any medication in.·If you're going to give somebody an injection, you need to put in a steroid or some type of medication, a nonsteroidal agent or some sort. But lidocaine is no more than lidocaine. It's the same as when you go to the dentist. It just numbs up your face.·**It's kind of a sham injection and I wouldn't do it.**

February 6, 2018 James Piotrowski Dep. Tr. 93:19-95:1 (emphasis added).

59.     Dr. Alvarez also failed to ensure Advantacare of Florida complied with all applicable federal and state laws. In fact, Dr. Alvarez personally engaged in unlawful conduct by pre-signing narcotic prescriptions for patients of Advantacare of Florida. By pre-signing prescriptions, Dr. Alvarez violated Florida Statutes § 456.42(1), which provides that "[a] written prescription for a medicinal drug issued by a health care practitioner licensed by law to prescribe such drug . . . must be signed by the prescribing practitioner on the day when issued."  Jason Smook, a physician assistant who worked for Advantacare of Florida, testified that his employment was terminated after he reported Dr. Alvarez to the United States Drug Enforcement Administration ("DEA"):

Q.      Do you have any opinions as to why you were laid off, other than Dr. Ahmed was also gone?

                              . . .

THE WITNESS: I had, two month [sic] prior to that, had **self-reported one of their clinics and one of the owners to the DEA for objectionable practices in the prescribing of narcotics out of their Daytona Beach office**.

BY MS. WOLFE:

Q.      What was going on with the prescriptions that you were aware of?

A.    I was asked to cover that clinic, which was not the norm. They had a different PA that worked there. And so I was the sole provider in that clinic. **One of my morning patients had a script for Tramadol, which is a Schedule Three controlled substance, left in the chart, which was dated that day, but was written for -- from the week prior when Dr. Alvarez was there. Dr. Alvarez was not in the building.** Discussed it with the patient, patient understood, actually didn't even want the Tramadol, no big deal, didn't think anything of it. Moving forward, **next patient, go to see them, opened the chart, hadn't been seen in the clinic by the provider for six months, had a prescription for, I want to say Percocet, it was either OxyContin or Percocet, Schedule Two narcotic nonetheless, that same scenario. And literally on the schedule was written "cash payer."**

. . .

I contacted the DEA for the sole purpose of getting clarity that what I thought and what I knew to be the DEA's policy on the prescribing of controlled substances, was the case. I called their regional office in Georgia. I was then transferred to an office in Florida. I was told Orlando, I have no way of confirming that, spoke to an Agent Colon and an Agent Woods on a recorded line, stated the case. They basically told me I did the right thing. Did you shred the prescription? Where is the patient? Patient fled as soon as they heard what was going on. Calamity ensued. **Dr. Alvarez called, cursed me out and told me that I was supposed to do what he told me to do.** Talked to another owner -- or one of the other owners, Carry Herzog, who was agreeable to what I did and felt that it was prudent for good medical care. And then got a phone call from another one of their pain managers, who also worked at an office, who was in shock that I would call the DEA.

Oct. 23, 2017 Jason Smook Dep. Tr. 33:16-35:22 (emphasis added).

**B.    Dr. Alvarez's Retirement Precipitated the Transition from Advantacare of Florida to Advantacare MSG**

60.    In or around March 2016, Dr. Alvarez retired from the practice of medicine at the age of 68.

61.    Following Dr. Alvarez's retirement, Fitzpatrick, Mancuso, and Howe continued Advantacare of Florida's operations under a new entity—Advantacare MSG.

62.    In May 2016, Fitzpatrick, Howe, and Mancuso applied to AHCA for a health care clinic license for each of Advantacare MSG's seven prospective locations, and represented Dr.

Alvarez was the medical director of five of these locations. At the time of the application, all seven of the prospective locations were operated by Advantacare of Florida.

63.     AHCA issued a health care clinic license for Advantacare MSG's seven prospective locations, and Advantacare MSG commenced operations in January 2017.

64.     As discussed below, Fitzpatrick, Howe, and Mancuso's operation of Advantacare MSG's Daytona Beach, Altamonte Springs, Debary, East Orlando, and Palm Coast Locations was unlawful because Dr. Alvarez did not fulfill his medical director duties under the HCCA.

### C.     Advantacare MSG and Its Medical Director, Dr. Alvarez, Failed to Comply with Florida Law In Performing Their Duties

65.     Advantacare MSG and Dr. Alvarez, the medical director of Advantacare MSG's Altamonte Springs, Daytona Beach, East Orlando, Debary, and Palm Coast locations, did not fulfill their duties under the HCCA.

66.     Advantacare MSG falsely represented to AHCA in its Health Care Licensing Applications that Dr. Alvarez was present at Advantacare MSG five days per week. Specifically, Advantacare MSG represented that Dr. Alvarez was at the Daytona Beach Location on Monday from 9:00 am to 2:00 pm, at the Palm Coast Location on Tuesday from 8:00 am to 12:00 pm, at the Altamonte Springs Location on Wednesday from 8:00 am to 4:00 pm, at the East Orlando Location on Thursday from 10:00 am to 2:00 pm, and at the Debary Location on Friday from 9:00 am to 2:00 pm.

67.     In reality, Dr. Alvarez was an absentee medical director who failed to provide day-to-day supervision of Advantacare MSG as required by Florida Administrative Code Rule 59A-33.008(1). Contrary to the representations made to AHCA, Dr. Alvarez testified he was only present at an Advantacare MSG Location *one day per month*. Oct. 10, 2017 Dr. Alvarez Dep. Tr. 36:25-37:7.  Even when Dr. Alvarez was purportedly present once a month, he did not devote this

time solely to perform his medical director duties.  Rather, he also used this time to appear for depositions. *Id*.

68.     Dr. Alvarez also failed to systematically review Advantacare MSG's billings as required by Florida Statutes § 400.9935(1)(g) and, as a result, failed to prevent Advantacare MSG from submitting unlawful and fraudulent insurance claims to State Farm Mutual and State Farm Fire.

69.     Dr. Alvarez did not utilize any "system" for selecting the charts he reviewed. Rather, Advantacare MSG selectively provided Dr. Alvarez with the documents he reviewed:

> [W]hat they give me would be a visit or an MRI, and **I don't have the entire chart at that visit**. I just have that visit, the HCFA for that, the visit, and any other papers they want to give me.  **I read very little.**

*Id* at 29:23-30:2 (emphasis added).

70.     Dr. Alvarez also admitted that his review was superficial. Specifically, Dr. Alvarez testified he reviewed the charts for "errors" but not for "content":

> A. [I] review records at the demand of the State for accuracy and for a level of care that matches what's billed and to make sure that they make medical sense as far as -- say, the patient has a headache from the accident and that's their main complaint, and the impression says "auto accident" or something like that. It doesn't mention any diagnosis for the headache. Well, that would be medically inappropriate. **So I review charts for those type of errors, not for the content or -- yeah, not for the content, as a rule.** Say, the MRI said -- if I happen to see the MRI and it said, "huge herniated disc with compressed nerve," and the impression is low back pain, that would be inappropriate. So I would review it for those type of errors.

*Id* at 28:22-29:12 (emphasis added).

71.     If Dr. Alvarez actually complied with his statutory and administrative duties, it should have been obvious that Advantacare MSG's bills and supporting documentation were not credible, but rather fraudulent and/or unlawful. Even if Dr. Alvarez conducted some *de minimus* review, his review was inadequate, and no corrective action was ever taken because Advantacare

MSG continued to submit bills and records with fraudulent patterns to State Farm Mutual and State Farm Fire.

72.    For example, Dr. Alvarez failed to take corrective action to address the fact Advantacare MSG diagnosed 94% of its rehabilitation patients with an emergency medical condition ("EMC"). *See* **Exhibit 9**. An EMC is defined as:

> [A] medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following:
> (a) Serious jeopardy to patient health.
> (b) Serious impairment to bodily functions.
> (c) Serious dysfunction of any bodily organ or part.

Fla. Stat. § 627.732(16).

73.    The fact Advantacare MSG determined that 94% of its rehabilitation patients had an EMC is not credible and wholly inconsistent with Advantacare MSG's diagnosis of non-specific, soft tissue injuries, including neck and back pain and strains

74.    The EMC determination was a central component of Advantacare MSG's scheme because it eliminated the $2,500 cap on PIP Benefits. Once an EMC was declared, Advantacare MSG could seek reimbursement for services up to $10,000. *See* Fla. Stat. § 627.736(1)(a)(3).

75.    Dr. Alvarez also failed to take corrective action to prevent Advantacare MSG from ordering and performing medically unnecessary MRIs. Advantacare MSG ordered and performed one or more MRIs on 82% of its rehabilitation patients. *See* **Exhibit 9**. Advantacare MSG billed State Farm Mutual and State Farm Fire more than $2,000 on average for each MRI, which constituted more than 20% of each patient's available PIP Benefits.

76.    MRIs are advanced diagnostic imaging procedures that should only be ordered if they are necessary for a diagnostic purpose or to guide treatment or for another specific purpose that is designed to benefit the patient as explained in the medical record.  For example, MRIs may

be appropriate when a patient's response to treatment is atypical or the provider has legitimate concerns about whether structural issues exist.  MRIs are almost never indicated in multiple regions of the spine and body simultaneously.  In addition, MRIs are rarely indicated for patients with soft tissue injuries because soft tissue injuries do not appear on an MRI. When MRIs are clinically indicated and ordered, medical providers should evaluate and document whether any abnormalities were identified via the MRI and whether those abnormalities have any clinical significance for the patient's current condition and treatment plan.

77.     Advantacare MSG referred patients for medically unnecessary MRIs which, for the majority of patients, were ordered and performed on at least two regions of the spine, and were rarely, if ever, used for any actual diagnostic or treatment purpose. *See* **Exhibit 9**. Instead, the MRIs were ordered to enrich Defendants by exploiting patients' No-Fault Benefits.

78.     The lack of medical necessity for the MRIs ordered by Advantacare MSG is underscored by the timing of the MRI orders.  Advantacare MSG Practitioners ordered MRIs at the outset of treatment, which is rarely appropriate in an outpatient clinical setting for automobile accident patients.

79.     Dr. Alvarez also failed to ensure that all health care practitioners at Advantacare MSG had active appropriate certification or licensure for the level of care being provided as required by Florida Statutes § 400.9935(1)(d).

80.     Notably, Advantacare MSG employed or engaged licensed massage therapists who purportedly performed therapeutic exercise with patients, which is beyond the scope of a licensed massage therapist's practice.[3] Dr. Alvarez did not detect or correct this unlawful practice, thus

---

[3] A licensed massage therapist's scope of practice is limited to "manipulation of the soft tissues of the human body with the hand, foot, arm, or elbow, whether or not such manipulation is aided by

allowing these individuals to practice as unlicensed physical therapists.[4]  Under Florida law, it is

unlawful for any person to practice physical therapy without an active license or temporary permit,

and practicing beyond the scope permitted by the Massage Therapist Practice Act (Florida Statutes

Chapter 480) constitutes grounds for denial of a massage therapist license or disciplinary action,

as specified in Florida Statutes § 456.072(2). Fla. Stat. §§ 486.151(1)(a), 480.046(1)(j).

81.     Moreover, the licensed massage therapists who worked for Advantacare MSG were

not qualified to perform therapeutic exercise. The American Medical Association's ("AMA")

*Current Procedural Terminology* ("*CPT*"), Fourth Edition, makes clear that therapeutic exercise

(CPT code 97110) is a skilled service that must be performed by a "physician or other qualified

health care professional." The *CPT* defines a "qualified healthcare professional" as:

> [A]n individual who is qualified by education, training, licensure/regulation (when
> applicable), and facility privileging (when applicable) who performs a professional
> service within his or her scope of practice and independently reports that
> professional services.

82.     The *CPT* expressly distinguishes qualified health care professionals from "clinical

staff." The *CPT* defines "clinical staff" as:

> [A] person who works under the supervision of a physician or other qualified health
> care professional, and who is allowed by law, regulation and facility policy to
> perform or assist in the performance of a specific professional service, but does not
> individually report that professional service.

---

hydrotherapy, including colonic irrigation, or thermal therapy; any electrical or mechanical device;
or the application to the human body of a chemical or herbal preparation." Fla. Stat. § 480.033(3).
[4] Even if therapeutic exercise was within the scope of a licensed massage therapists' scope of
practice, the service would constitute "massage" as defined in Florida Statutes § 480.033(3) and
thus, would be rendered non-compensable under the No-Fault Law. Florida Statutes §
627.736(1)(a)(5) provides in this regard:

> Medical benefits do not include massage as defined in s. 480.033 . . . regardless of
> the person, entity, or licensee providing massage . . ., and a licensed massage
> therapist . . . may not be reimbursed for medical benefits under this section.

83.     A licensed massage therapists is not a "qualified healthcare professional" because therapeutic exercise is not within a licensed massage therapist's scope of practice. *See* Fla. Stat. § 480.033(3). Consequently, the licensed massage therapists who worked for Advantacare MSG were not qualified to perform therapeutic exercise.

84.     Dr. Alvarez did not detect or correct this unlawful practice, thus allowing licensed massage therapists to practice as unlicensed physical therapists.

85.     Advantacare MSG and Dr. Alvarez knew or should have known that Dr. Alvarez was not compliant with the requirements for medical directors in Florida under the HCCA.

86.     As a result of Advantacare MSG and Dr. Alvarez's failure to satisfy their duties under the HCCA, they failed to detect (or willfully ignored) and take correct action to prevent fraudulent and unlawful conduct at Advantacare MSG.

## VI.     CLAIMS FOR RELIEF

### First Claim for Relief

### (Violations of the Florida Deceptive and Unfair Trade Practices Act Against Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe)

87.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 86 above.

88.     In each claim described in **Exhibit 1**, Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the FDUTPA. *See* Fla. Stat. §§ 501.201-501.213.

89.     These acts and practices included a secret arrangement between Fitzpatrick, Mancuso, Howe, and Dr. Alvarez in which Dr. Alvarez agreed to be held out to the public (and AHCA) as wholly owning Advantacare of Florida to qualify for a licensure exemption, when, in actuality, Fitzpatrick, Mancuso, and Howe owned, controlled, and operated Advantacare of

Florida. As a result of this secret arrangement, Advantacare of Florida operated unlawfully as an unlicensed health care clinic in contravention of the HCCA. Advantacare of Florida's failure to maintain a health care clinic license rendered its charges noncompensable and unenforceable.

90.     These acts and practices also included intentionally and knowingly making, and causing to be made, false and fraudulent statements of material fact to State Farm Mutual, State Farm Fire, and AHCA, injuring State Farm Mutual and State Farm Fire insureds, the State of Florida, and the public as a whole.

91.     Specifically, Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe deceived and defrauded State Farm Mutual and State Farm Fire by (a) holding themselves out to State Farm Mutual and State Farm Fire as a clinic that was lawfully providing services while knowing of the falsity of their purported licensure exemption; and (b) failing to disclose to State Farm Mutual and State Farm Fire that Fitzpatrick, Howe, and Mancuso secretly held an ownership interest in Advantacare of Florida and that it was not wholly owned by licensed health care practitioners.

92.     Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe were able to sustain the fiction that Advantacare of Florida qualified for the "wholly owned" licensure exemption by providing false information to AHCA, including Fitzpatrick's April 24, 2013 email to Isabelle Kalms in which she falsely represented that Advantacare of Florida was wholly owned by licensed health care practitioners. Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe intended to deceive AHCA so that automobile insurers, including State Farm Mutual and State Farm Fire, would rely on their purported exempt status in processing the bills and related documentation for payment.

93.     Florida Statutes § 626.9541 defines knowingly causing to be presented to any insurer "a false claim for payment" as an unfair method of competition and unfair or deceptive act or practice. Fla. Stat. § 626.9541(1)(u).

94.     Defendants Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe knowingly presented or caused to be presented a false claim for payment each time they presented or caused to be presented charges for services that were not lawful when they were rendered.

95.     These violations of the HCCA and Florida Statutes § 626.9541 are *per se* FDUTPA violations.

96.     In addition, Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe's above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing the charges were lawful when they were rendered.

97.     Further, Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe's above-described conduct was unfair.  The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous.  This conduct produced no benefits to consumers or competition.

98.     Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe are jointly and severally liable for the false and unlawful claims submitted to State Farm Mutual and State Farm Fire because they each played an intentional and essential role in furthering the unlawful scheme.

99.     As a result of these Defendants' deceptive and unfair practices, State Farm Mutual and State Farm Fire were aggrieved and suffered actual damages in excess of $4.5 Million.

100.     State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 501.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages in an amount to be proven at trial, interest thereon, attorney's fees, and costs against Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe, jointly and severally, and grant such other relief as the Court deems just and appropriate.

## Second Claim for Relief

### (Unjust Enrichment Against Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, Howe, and CRN Receivable Management,)

101.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 86 above.

102.     In each claim described in **Exhibit 1**, State Farm Mutual and State Farm Fire conferred a benefit upon Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Howe, Mancuso, and CRN Receivable Management, by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

103.     Because these Defendants knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire charges for services that were not lawful when they were rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

104.     As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Howe, Mancuso, and CRN Receivable Management have been unjustly enriched by more than $4.5 million.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages in an amount to be proven at trial, interest thereon, and costs against Advantacare of Florida, Dr. Alvarez, Fitzpatrick, Mancuso, Howe, and CRN Receivable Management jointly and severally, and grant such other relief as the Court deems just and appropriate.

### Third Claim for Relief

### (Declaratory Relief Pursuant to 28 U.S.C. § 2201 Against Advantacare of Florida)

105.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 86 above.

106.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and Advantacare of Florida, on the other, with regard to any claims or charges that are for services that were not lawfully rendered that are pending through the date of this Complaint and the trial of this case, including but not limited to the unpaid and allegedly underpaid claims set forth in in **Exhibits 1 and 10**.

107.    Advantacare of Florida has engaged in an unlawful license circumvention scheme designed to deceive and mislead State Farm Mutual and State Farm Fire.

108.    As a result, none of the services for which Advantacare of Florida submitted bills to State Farm Mutual and State Farm Fire were "lawfully provided" as required for Advantacare of Florida to seek or obtain reimbursement for these purported services pursuant to Florida Statutes § 627.736 and § 400.9935.

WHEREFORE, State Farm Mutual and State Farm Fire seek a judgment declaring that all outstanding unpaid and allegedly underpaid claims and charges that Advantacare of Florida submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire to date and through

the trial of this case, including but limited to the claims set forth in **Exhibits 1 and 10**, are not

owed.

## Fourth Claim for Relief

### (Violations of the Florida Deceptive and Unfair Trade Practices Act Against Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe)

109.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though

fully set forth herein, each and every allegation in paragraphs 1 through 86 above.

110.    In each claim described in **Exhibit 11**, Advantacare MSG, Dr. Alvarez, Fitzpatrick,

Howe, and Mancuso engaged in unfair and deceptive acts and practices in the conduct of trade and

commerce, in violation of the FDUTPA, at Advantacare MSG's Daytona Beach, Altamonte

Springs, Debary, East Orlando, and Palm Coast Locations. *See* Fla. Stat. §§ 501.201-501.213.

111.    These acts and practices included Advantacare MSG's and Dr. Alvarez's failure to

comply with their statutory and administrative medical director duties, which rendered the services

provided to State Farm Mutual and State Farm Fire insureds at Advantacare MSG's Daytona

Beach, Altamonte Springs, Debary, East Orlando, and Palm Coast Locations unlawful and

noncompensable.

112.    These acts and practices also included intentionally and knowingly making, and

causing to be made, false and fraudulent statements of material fact to State Farm Mutual, State

Farm Fire, and AHCA, injuring State Farm Mutual and State Farm Fire insureds, the State of

Florida, and the public as a whole.

113.    Specifically, Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe

deceived and defrauded State Farm Mutual and State Farm Fire by (a) providing false information

to AHCA to obtain health care clinic licenses, including representations in the Health Care Clinic

Licensing Applications that Dr. Alvarez was present at Advantacare MSG five days per week and

providing day-to-day supervision of Advantacare MSG's Daytona Beach, Altamonte Springs, Debary, East Orlando, and Palm Coast Locations, upon which they intended for State Farm Mutual and State Farm Fire to rely in processing the bills and related documentation for payment; and (b) falsely representing that Dr. Alvarez complied with his duties under Florida law with regard to five clinic locations where he served as medical director to conduct systematic reviews to ensure the billings were not fraudulent or unlawful, take immediate corrective action upon discovery of an unlawful charge, provide day-to-day supervision and oversight of Advantacare MSG, and properly ensure that all health care practitioners at Advantacare MSG had active appropriate certification or licensure for the level of care being provided.

114.    Florida Statutes § 626.9541 defines knowingly causing to be presented to any insurer "a false claim for payment" as an unfair method of competition and unfair or deceptive act or practice. Fla. Stat. § 626.9541(1)(u).

115.    Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe knowingly presented or caused to be presented a false claim for payment each time they presented or caused to be presented charges for services that were not lawful when they were rendered.

116.    These violations of the HCCA and Florida Statutes § 626.9541 are *per se* FDUTPA violations.

117.    In addition, Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe's above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing the charges were lawful when they were rendered.

118.    Further, Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe's above-described conduct was unfair.   The conduct was contrary to Florida public policy and was

unconscionable, immoral, unethical, oppressive, and unscrupulous.   This conduct produced no benefits to consumers or competition.

119.    Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe are jointly and severally liable for the false claims submitted to State Farm Mutual and State Farm Fire because they each played an intentional and essential role in furthering the unlawful scheme.

120.    As a result of these Defendants' deceptive and unfair practices State Farm Mutual and State Farm Fire were aggrieved and suffered actual damages in excess of $2.9 million.

121.    State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 501.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages in an amount to be proven at trial, interest thereon, attorney's fees, and costs against Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### Fifth Claim for Relief

### (Unjust Enrichment Against Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe)

122.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 86 above.

123.    In each claim described in **Exhibit 11**, State Farm Mutual and State Farm Fire conferred a benefit upon Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

124.     Because these Defendants knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire charges for services at Advantacare MSG's Daytona Beach, Altamonte Springs, Debary, East Orlando, and Palm Coast Locations that were not lawful when they were rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

125.     As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe have been unjustly enriched by more than $2.9 million.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in its favor and award compensatory damages in an amount to be proven at trial, interest thereon, and costs against Advantacare MSG, Dr. Alvarez, Fitzpatrick, Mancuso, and Howe, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### Sixth Claim for Relief

### (Declaratory Relief Pursuant to 28 U.S.C. § 2201 Against Advantacare MSG)

126.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in paragraphs 1 through 86 above.

127.     There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and Advantacare MSG, on the other, as to all claims and charges that Advantacare MSG has submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire for services that were not lawfully rendered that are pending through the date of this Complaint and the trial of this case, including but not limited to the unpaid and allegedly underpaid claims set forth in in **Exhibits 11 and 12.**

128.    To the extent any such claims and charges are for services that were not lawfully rendered and are pending through the date of this Complaint and the trial of this case, State Farm Mutual and State Farm Fire contends no such claims and charges are owed for the reasons discussed above.

129.    The services of Advantacare MSG provided at the five clinic locations where Dr. Alvarez served as medical director are unlawful because Advantacare MSG and Dr. Alvarez failed to comply with their statutory and administrative medical director duties.

130.    As a result, none of the services at the five clinic locations where Dr. Alvarez served as medical director for which Advantacare MSG submitted bills to State Farm Mutual and State Farm Fire were "lawfully provided" as required for Advantacare MSG to seek or obtain reimbursement for these purported services pursuant to Florida Statutes § 627.736 and § 400.9935.

WHEREFORE, State Farm Mutual and State Farm Fire seek a judgment declaring that all outstanding unpaid and allegedly underpaid claims and charges that Advantacare MSG submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire to date and through the trial of this case, including but limited to the claims set forth in **Exhibits 11 and 12**, are not owed.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury of all issues so triable.

Dated: September 24, 2019                    Respectfully submitted,


By: */s/ David I. Spector*
    DAVID I. SPECTOR, ESQ.
    Fla. Bar No. 086540
    david.spector@hklaw.com
    JAMES J. DUFFY, ESQ.
    Fla. Bar No. 0068662

james.duffy@hklaw.com
JOSEPH F. VALDIVIA, ESQ.
Fla. Bar No. 0107878
joseph.valdivia@hklaw.com
HOLLAND & KNIGHT LLP
222 Lakeview Avenue
Suite 1000
West Palm Beach, Florida  33401
Telephone:  (561) 833-2000
Facsimile:   (561) 650-8399

*Attorneys for Plaintiffs*